STATE OF MONTANA, Plaintiff and Respondent, v. ERNEST McKNIGHT, Defendant and Appellant.

No. 9401.
Argued November 23, 1954. Decided March 25, 1955.
281 Pac. (2d) 816.

Messrs. Rankin & Acher, Helena, Mr. H. B. Landoe, Bozeman, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Emmet T. Walsh, Asst. Atty. Gen., Mr. E. E. Fenton, Co. Atty., Treasure County, Hysham County, Mr. Bert W. Kronmiller, Spec. Prosecutor, Mr. C. W. Jones, Co. Atty., Big Horn County, Hardin, for respondent.

Mr. Landoe, Mr. Rankin, Mr. Acher, Mr. Kronmiller, Mr. Fenton and Mr. Emmet T. Walsh argued orally.

MR. JUSTICE BOTTOMLY:

The defendant, Ernest McKnight, was charged by information filed on October 28, 1952, in the district court of Treasure County, with the crime of receiving stolen property knowing the same to have been stolen in that he did wilfully, unlawfully, knowingly and feloniously and for his own gain and to prevent the owners from again possessing their own property, buy and receive from one Albert Newman, sixteen yearling heifers and seven cows, the property of Homer A. Scott and Dan Scott, doing business as Scott Land and Livestock Company, and six cows, the property of Padlock Ranch Company, Inc., all of said animals being branded FS on left ribs, all of which property had been previously stolen, and the said Ernest McKnight then and there knowing the same to have been stolen.

The defendant McKnight was tried in Treasure County in May 1953. The jury was unable to agree upon a verdict and was discharged. In September 1953 the court, on motion of counsel for the state and over objections of defendant, ordered the case transferred for trial to Big Horn County, wherein it was

tried in December 1953. The jury returned a verdict of guilty. From the judgment of conviction and from the order denying the motion for a new trial the defendant appeals. (The court issued its certificate of probable cause and admitted defendant to bail in the sum of $2,500.)

The facts in this case are somewhat complex as the transcript comprises five volumes of over eleven hundred pages.

From the record we summarize the facts as follows:

The defendant Ernest McKnight was engaged in ranching in Gallatin County, where he had some 300 head of cattle. In December of 1950 he sold this ranch, moved to Billings and through realtor Tannehill, bought what was known as the ''Carl Frazer Ranch'' consisting of some 6,000 acres located in Treasure County, together with the farm machinery and some 195 head of cattle. The machinery was valued at about $12,000 and consisted of a combine, truck, three tractors, etc.

During this time defendant was buying and selling cattle and continued to live in Billings visiting the ranch in Treasure County off and on to help with haying and other ranch matters. He had working on the ranch one Everett Knowlton and one Robert Parks who moved on the ranch and took care of the ranch and cattle. Defendant took his cattle that had been running on the Gallatin ranch to this ranch in Treasure County and bought additional cattle.

In February of 1951 Tannehill, the realtor, took defendant from Billings to look over another ranch that he thought defendant might want to buy; it was the Albert Newman place which was adjacent to defendant's ranch. Defendant with Tannehill and Newman spent an hour or hour and a half looking over the ranch. It was snowing and blowing. Tannehill stated he observed a small bunch of white-faced cattle, perhaps twenty-five, and that they were probably 100 yards from them.

Tannehill and defendant rode in the front seat and Newman in the rear seat. They discussed the land and the ranch in general. Defendant did not buy the Newman ranch.

Newman testified, *inter alia*, that in January 1951 he stole

twenty-four head of cows from the Padlock and the Scott Land and Livestock Company, that in May 1951 he went back and stole eighteen or nineteen head of heifers; the cows and heifers were branded with the Padlock brand and the Bar-A-Bar or Bar-X-Bar, some with the Two-A-Bar and Padlock brand and other brands; he testified further that he stole forty-four head in all.

On January 17, 1951, Newman made application to the state livestock commission at Helena for a livestock brand for cattle, and used the name of Frank Saage as the applicant and gave the address as General Delivery, Billings, Montana.

The state livestock commission processed this application and issued on February 1, 1951, a certified recorded brand for cattle designating FS on left ribs, to Frank Saage, General Delivery, Billings, Montana.

Newman testified: ''Q. What was your purpose for obtaining this brand? A. To brand these cows that I had got from the Padlock Land and Livestock Company. Q. And the heifers also? A. Yes.''

Newman testified that he branded the cows and heifers which he had stolen within a week or so after receiving the certified recorded brand, branding them FS on left ribs, cropped their ears and barred out or vented and attempted to obliterate the brands then on the cattle.

Newman then made arrangements for and checked in these stolen cattle so treated and branded on the Froze-to-Death Grazing District in April or May 1951, together with other cattle he possessed. McKnight had some of his cattle running in this Froze-to-Death Grazing District this same year.

The Froze-to-Death Grazing District was a Taylor grazing district which was approximately 30 to 40 miles long and 25 to 30 miles wide and is located northerly of the then Albert Newman place and the place then owned by McKnight.

Arthur J. Fenton, witness for defendant, was the range rider for the Froze-to-Death Grazing District and testified, *inter alia,* that he was the range rider for the district in 1951, his duties consisted of looking after the cattle that were turned into the

district; seeing that the cattle did not get stuck in the mud holes, leading and running the roundup, and controlling the district; that in 1951 Albert Newman turned into the said district the stolen cattle branded FS on left ribs; that the cattle had other vented brands on them; that he as range rider had no suspicion regarding the propriety of the cattle bearing the FS brand being upon the district; that other ranchers had cattle there with several brands on them besides the owner's brand, some carried as many as four or five brands; that the custom is when you buy cattle to go by the brand on the bill of sale that corresponds to the brand on the animal.

Along in November 1951 the ranchers who had cattle running on this grazing district, or their representatives, along with Newman and McKnight, which made up quite a crew of men on the roundup, gathered together the cattle to cut them out and take them off that range. Newman testified, *inter alia,* that he and McKnight made a deal in which he sold McKnight 39 head of the stolen cattle; that he told McKnight that these FS cattle were stolen; that there was no person by the name of Frank Saage, that he had applied for the FS brand in the name of Frank Saage; that he and McKnight were alone when the deal was made and in the deal it was figured out that McKnight would pay him about half price for the cattle, and to make the sale look like it was a legitimate deal, machinery was taken in at an agreed price; that the machinery was to be returned to McKnight; that the cows were priced at $250 and the heifers at $200 per head; that after the deal was made in Newman's pasture, Newman drove the cattle from Newman's pasture down to McKnight's ranch which was about eight miles; that at that time Newman told McKnight he had to get a bill of sale from Frank Saage;

That Newman thereafter brought to McKnight a bill of sale completely made out for the 19 cows and 20 yearling heifers, the bill of sale being dated November 10, 1951, and signed by the name of Frank Saage as owner of the cattle branded with the recorded brand FS on left ribs. Newman testified that he

signed the name Frank Saage to the bill of sale and signed the name R. L. Gunderson as a witness thereto.

All the cattle delivered to McKnight by Newman were branded FS on the left rib. McKnight gave a check in the sum of $3,950 to Newman, payable to Frank Saage, such check being thereafter endorsed by the name of Frank Saage, and Sid Newman, a brother of Albert Newman, and Albert Newman received the money from the said check.

Albert Newman then lined up pasture for the cattle he had transferred to McKnight at his uncle Alex Newman's ranch, which was located some 25 miles distant. Albert Newman also helped drive the cattle to his uncle's ranch.

On cross-examination Newman testified: That he had pled guilty to stealing the cattle before the first McKnight trial; that the agreed price when he sold the cattle to McKnight was to be at the rate of $200 per head for the heifers and $250 per head for the cows and that was about the going price.

On the sale of the machinery by McKnight to Newman, as the balance of the purchase price of the cattle, Newman testified:

"Q. And it was agreed that the truck should be taken in for $2500, that's correct isn't it? A. That was the value of the truck—about what it was worth.

"Q. And you agreed that $800 was the right price for the combine? A. Yes.

"Q. And you agreed that $500 was the right price for the tractor? A. Yes.

"Q. And you had borrowed $700 from McKnight in Billings to make a payment on a car? A. Yes.

"Q. And those, with what you had borrowed, the $700, and the $2500, and the $800, and the $400 for the tractor, and the $3950, made $8450, didn't it? A. Well it is—the $700 I paid that back to him.

"Q. But with the $700, it would make $8450? A. Well I can't add that fast.

"Q. Well, I can't either, I had help here. I will take this

14

piece of chalk. Do you want to look at the board and see if that is correct? A. Yes.

''Q. That seems to be correct, doesn't it? A. Yes.

''Q. And you say the machinery part of this was just a phony deal, is that right? A. Yes.

''Q. Then if it was a phony deal, then why did you not give him back the combine? A. There was no way he could take it back.

''Q. Isn't it a fact that you traded the combine in on a baler? A. My brother did, yes.

''Q. Well how did your brother get the combine? A. I gave it to him.

''Q. Well you gave it to your brother to trade in on a baler? A. Yes.''

As to the tractor taken by Newman from McKnight in part payment for the cattle, Newman testified:

''Q. The tractor at Joliet, after you received that, at the time you sold the cattle to McKnight, you used the tractor did you not? A. I never did use it, no.

''Q. Well, it was being used by you and your brother wasn't it, one or the other? A. I don't know, I guess maybe he did use it.''

There was a great deal of testimony in regard to the GMC truck that was purported to be taken in on the deal at the value of $2500. Suffice to say that under the disposition we make of this case nothing further need be said in regard to the truck and the different transactions connected therewith.

However, on cross-examination, Albert Newman testified in regard to the bill of sale as follows:

''Q. Didn't you testify at the trial in Hysham, as follows: Question, by Mr. Landoe— A. I wasn't in the trial at Hysham—

''Q. (Quoting from the transcript of testimony given by Albert Newman at the first McKnight trial at Hysham): 'Q. Now I notice this bill of sale that is in evidence for these animals for which you made this deal is dated November 10th, 1951. You didn't have that bill of sale with you when you came over to

McKnight with the cattle did you? A. No. Q. You told Mr. McKnight that you would have to get a bill of sale from Frank Saage, isn't that right? A. Yes.' A. That's Saage?

"Q. From Frank Saage, isn't that right, answer 'yes'—did you so testify? A. Yes.

"Q. All right, if you testified at the last trial that you told McKnight that you had to get a bill of sale from Saage, when you delivered the cattle, that shows, doesn't it, that you hadn't told McKnight, as you said here today, out on the range, that you told him this bill of sale was phony, or you wouldn't have told on the witness stand that you told him when he delivered the cattle, that you couldn't give him the bill of sale because you had to get it from Frank Saage, isn't that right? A. Well, his hired man was there.

"Q. Why did you say at the trial—A. (Interrupting) That's what I told—that's what I told him, just what I said.

"Q. You told him that you would have to get the bill of sale and couldn't give it to him? A. Him and a couple of his hired men.

"Q. You didn't say anthing about hired men at the other trial at that time? A. I guess I didn't.

"Q. And after you said 'Yes' in response to that question. 'You told McKnight that you would have to get a bill of sale from Frank Saage, isn't that right?' you answered 'yes,' and then the next question: 'Q. That's what you told him? A. Yes. Q. And when you brought it to him this was the bill of sale you brought, dated November 10th, 1951, is that right, this bill of sale here? A. Let me see it, yes that's it. Q. And that was brought to Mr. McKnight on the 28th day of November, 1951, wasn't it, the same day he gave you the check ? A. Yes.' A. But he didn't give me the check the same day.

"Q. Well, did you falsify there? A. I just made a mistake.

"Q. Made a mistake; you were under oath when you testified at the trial in Hysham, where Mr. McKnight's liberty— were you not? A. Well there were several deals where people have had to correct their statements."

Raymond Buckley, sheriff of Treasure County, called as a witness for the defendant, testified, *inter alia,* that he had lived all his life in said county except when in military service; that he brought Albert Newman back from the penitentiary to Hysham on May 10, 1953, to attend the trial there against Ernest McKnight and that he brought him by auto; that he had known Albert Newman since 1947; that on the way to Hysham, near Livingston, Newman stated to Sheriff Buckley, that "If McKnight would have dropped the mortgage, I would not have involved him in this case."

Jack Welch, a witness called as a witness for defendant, testified, *inter alia,* that he had lived in Hysham all his life except for the time he was in the military service; that during the trial of Ernest McKnight at Hysham he held the official position of undersheriff and Raymond Buckley was sheriff; that he had known Albert Newman since 1948; that he talked to Albert Newman while the case against Ernest McKnight was being tried at Hysham and that on the second or third day of that trial Albert Newman, while in his custody, told him, "I went to see McKnight and tried to get him to cancel the mortgage, if he would have cancelled the mortgage, I wouldn't have implicated him in this case."

The main witness for the state was Albert Newman, the confessed thief, who was serving a sentence in the state prison for larceny of three head of cattle, and was brought back to testify in this case. On direct examination of Newman, after he had testified in detail, how he had told McKnight all about his stealing the cattle and that there was no person by the name of Frank Saage, how he had obtained the certificate for the FS brand, etc., the state then asked Albert Newman: "Q. Mr. Newman, did you *ever sell* or otherwise dispose of *any of these cattle* that you had purchased or *that you had stole from the Scott Land and Livestock Company?* A. Yes." Emphasis supplied.

Thereafter on cross-examination the witness Newman testified relative to the sale to McKnight: "Q. And didn't you at the place when you were discussing the heifers and the other

animals in the pasture say to him that you had sold some of these cattle at that time, and that $250 for the cows and $200 for heifers was a fair price because that's what you got on the market when you sold these same FS cattle?'' Objection was made and overruled. ''A. I don't believe I did because the cattle I sold in Billings brought $300 apiece. Q. Some of these FS cattle?'' Objection was made that this was incompetent, irrelevant, immaterial and improper cross-examination. The objection was sustained. The witness was then asked: ''Q. Isn't it a fact, Mr. Newman, that these FS cattle were approved by the inspectors when they were sold?'' Objection was made and the court interposed,

''Court: I don't know what cattle you refer to when you say 'FS cattle.'

''Mr. Rankin: The cattle that were stolen from the Scott place, and he put the FS Frank Saage so-called brand on them.

''Court: You mean is your question that they were approved, that they were passed by the inspectors at the time of the sale to McKnight?

''Mr. Rankin: At the time of the sale in the Billings yards, a number of them—in other words, to show that his possession was open and notorious and that even the inspectors didn't recognize anything wrong about it, and therefore McKnight wouldn't.

''Mr. Kronmiller: Same objection.

''Court: Objection sustained.''

Continuing the cross-examination of the witness,

''Q. I show you Mr. Newman, defendant's Exhibit 'U,' purporting to be a check to Frank Saage, did you endorse that? A. Yes.

''Q. Did you sign the name, 'Frank Saage'? A. Yes.

''Q. And also the name 'Albert Newman'? A. Yes, I did.

''Q. And what is that? A. That is a check for $1,156.56.

''Q. What is that for?''

Objection was made. ''Mr. Rankin: I would like to ask another question first, if it please the court. Q. Mr. Newman, was this check in payment for some of the cattle that were stolen

from the Scott Land & Livestock Company, the same as the cattle that were sold to McKnight?''

Objection was made and sustained. ''Mr. Rankin: The defendant now makes Offer of Proof No. 4. 'The defendant offers to prove by the witness Albert Newman on the stand, on or about April 15, 1951, he hauled four cows to the Billings Public Stockyards and that the animals were sold on the open market, the check in payment was made payable to Frank Saage, was received by the witness and the proceeds retained, and that said four cows were of the 44 head which the witness has heretofore testified that he stole from Scott Land and Livestock Company, a partnership, or from Padlock Ranch Company, Inc.' ''

Objection was made and sustained, and offer of proof denied.

''Q. Did you sell the cattle with the F-S brand that you had put on, that you got from—stole from the Scott Land & Livestock Company, and from the same 44 head to the Farmers Union Livestock Association?''

To which objection was made and sustained.

''Q. Mr. Newman, I show you defendant's Proposed Exhibit marked 'V' and ask you whether or not you signed on the back of this check 'Frank Saage' 'Albert Newman'?   A. Yes.

''Q. And what is it?   A. It is a check for $275.00.

''Q. And from whom?''   Objection was made and sustained.

''Mr. Rankin: We offer Defendant's Exhibit 'V' in evidence.'' Objection was made and sustained and the offer denied.

Mr. Rankin then made defendant's offer of proof No. 5   ''Mr. Rankin: The defendant offers to prove by the witness Albert Newman on the stand that on or about August 13, 1951, he hauled one cow to the Billings Public Stockyards and that the animal was sold on the market, being the animal referred to in Defendant's Proposed Exhibit T, that a check in payment for the animal was received by the witness; that the check was payable to Frank Saage, that the check was cashed by the witness and the proceeds retained; that said cow was one of the animals included among the 44 head which the witness has heretofore testified that he stole from Scott Land and Livestock Company,

a partnership, or from Padlock Ranch Company, Inc.; said animal having either the Padlock Inc. brand or one of the Scott Land and Livestock Company brands, similar to that on the cattle later delivered to the defendant McKnight." Objection was made.

"Court: All right, objection sustained, and offer denied."

Defendant specifies error in the court's refusal to admit evidence as to sales of the stolen cattle by Albert Newman to others than defendant McKnight; in its denial of the foregoing offers of proof; in its striking certain testimony of the state's witness Burns given on cross-examination and in sustaining the objection to defendant's offer of proof No. 7.

We are of the opinion that the court erred to the prejudice of the defendant in so limiting the cross-examination of the state's witness Newman. The state opened the door wide in asking this witness on direct examination if the witness *had ever sold* or otherwise disposed of *any* of these cattle that witness *had stolen from the Scott Land & Livestock Company,* and the witness answered, "Yes."

The defense was then entitled to examine as to any and all of the 44 head so stolen.

As stated in 58 Am. Jur., Witnesses, sec 632, page 352, "Generally speaking, however, when the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts which constitute a unity, or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief by the witness on cross-examination."

This court has said: "The right of cross-examination, as has been often said, is a valuable and substantial right, and the

courts should incline to extend, rather than to restrict it. Cross-examination is the most potent weapon known to the law for separating falsehood from truth, hearsay from actual knowledge, things imaginary from things real, opinion from fact, and inference from recollection, and for testing the intelligence, fairness, memory, truthfulness, accuracy, honesty, and power of observation of the witness. It has become a truism in the legal profession that—'The testimony of a witness is not stronger that it is made by his cross-examination.' '' State v. Ritz, 65 Mont. 180, 187, 211 Pac. 298, 300.

The sale by Albert Newman of *any* of the 44 head which he had stolen from the Scott interest besides those he had attempted to sell to McKnight, the price he obtained therefor, and the fact that the cattle so sold had been inspected for brands and passed by the state livestock commission's expert brand inspectors were relevant in showing that defendant McKnight was no more culpable or blameworthy in not recognizing and noting the vented brands than the state's professional brand inspectors.

In State v. Howard, 30 Mont. 518, 527, 77 Pac. 50, 54, this court said: ''The right of cross-examination extends not only to all facts stated by the witness in his original examination, *but to all other facts connected with them, whether directly or indirectly,* which tend to enlighten the jury upon the question in controversy, and this right should not be restricted unduly.'' Emphasis supplied. Compare Sherrick v. State, 157 Neb. 623, 61 N. W. (2d) 358, 365.

In 70 C. J., Witnesses, sec. 792, page 619, it is stated: ''* * * ▮ as a general rule, in the interests of truth and justice, a wide latitude should be permitted, in the cross-examination of an adverse witness; or as otherwise stated, a full cross-examination should be permitted.''

On the right of cross-examination, in Paulk v. State, 107 Tex. Cr. R. 174, 296 S. W. 588, 592, that court said:

''In the right of cross-examination is embraced the right 'to have the assistance of counsel for his defense' guaranteed by the Sixth Amendment to the Constitution of the United States and

by the Bill of Rights, art. 1, sec. 10, of the Constitution of Texas. Of it, it is said:

" 'The importance of the right of full cross-examination can scarcely be overestimated. * * * It is the clear right of the cross-examining party to elicit suppressed facts, which weaken or qualify the case of the cross-examining party.' 1 Thompson on Trials, (2d) Ed., page 420, sec. 406.''

In Thompson on Trials, cited above, it is further stated: " 'A witness may be cross-examined as to his examination in chief in all its bearings, and as to whatever goes to explain or modify what he has stated in his examination in chief,' and *prejudice* will be *presumed* when this right is denied." See Wharton's Criminal Evidence, 11th Ed., Witnesses, sec. 1291, pages 2161, 2162, and sec. 1294, pages 2165, 2166. Compare Cossack v. United States, 9 Cir., 63 F. (2d) 511, 516. In Armstrong v. State, 131 Tex. Cr. R. 140, 97 S. W. (2d) 192, 193, that court said: "We think the court fell into error in rejecting said proof, as it tended to show that appellant received the automobile in good faith, believing that it was the property of Johnson.''

The fact that Newman, prior to the time that it is claimed he sold the cattle to McKnight, had sold five head of the same branded stolen cattle through the public market at Billings, where they had been inspected by the state inspectors of brands, and had informed McKnight of the same, would tend to support defendant's claim that his purchase of the cattle was in good faith and that he believed said cattle to be the property of Frank Saage in whose name the recorded brand had been issued. This excluded testimony would show circumstances favorable to the defendant and he was entitled to have it considered by the jury. It was evidence of an independent fact, the door to which was opened by the state. See Harwell v. State, 22 Tex. App. 251, 2 S. W. 606, 607, cited in Armstrong v. State, supra.

Defendant predicated error on the court's refusal to give defendant's instructions Nos. 11, 12 and 13, on the assumption that under the facts and circumstances the witness Albert New-

man was an accomplice of Ernest McKnight. The defendant's instructions which were offered and refused are as follows:

No. 11. "You are instructed that a conviction cannot be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

No. 12 "You are instructed that it is a question of fact for the jury to determine from the evidence and from the law as given you by the court whether or not in this particular case the witness Albert Newman was or was not an accomplice within the meaning of the law.

"An accomplice is one who knowingly and voluntarily, with common intent with the principal offender, unites in the commission of a crime. One may become an accomplice by being present and joining in the criminal act, by aiding and abetting, with criminal intent, another in its commission or in being present by advising and encouraging its commission, but knowledge and voluntary action are essential in order to impute guilt."

No. 13 "You are instructed that the testimony of an accomplice ought to be viewed with distrust."

The state contends that Albert Newman is not an accomplice because he was the thief and that the thief cannot be an accomplice of the receiver under the rule announced in our Montana decisions, and that, "It is an elementary principle of law that the principal in a theft, or the person who actually steals the property, cannot be convicted of the crime of receiving, concealing, or aiding in the concealment of the property stolen." Annotations, 136 A. L. R. 1088.

The jurisdictions are evenly divided on the question as to whether the thief is an accomplice of the receiver. Under our statute larceny and the knowingly receiving of stolen personal property are each a crime. R. C. M. 1947, sections 94-2704 and 94-2721.

Our statutes do not define an accomplice. However, R. C. M. 1947, sec. 94-7220, provides: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

It is true as the state contends that this court's decisions have set forth the general rule that the theft and the receiving are two separate and distinct crimes; that the thief cannot receive from himself and therefore the thief is not and cannot be an accomplice of the receiver. We think this rule is too broad without limiting the rule to cases where the thief did not participate with the receiver in other subsequent acts in connection with the commission of the crime of receiving stolen property. Those cases which have passed upon this question and laid down the rule generally, that the thief is not an accomplice of the receiver within the rule requiring corroboration of the evidence of an accomplice, rest upon the assumption mainly that because larceny and receiving are separate offenses the thief cannot be charged with receiving. Such cases (none of which contained the facts and circumstances presented in this case) have overlooked our substantive statute, R. C. M. 1947, sec. 94-204, which does define principals: "*All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission * * * are principals in any crime so committed.*" Emphasis supplied.

Can it be argued that witness Albert Newman was not concerned in the commission of this crime? Can it be said that Albert Newman, the thief, did not aid in its commission? Can it be said said that Albert Newman was not concerned in, did not abet, encourage, instigate and countenance this crime? To ask the question is to answer in the affirmative. The thief, Al-

bert Newman, who took a check payable to a fictitious person, in whose name the brand was recorded, who forged the bill of sale, who made arrangements for the pasture for the stolen cattle, and who helped drive these stolen cattle to an area some 25 miles distant more than three weeks after he had placed the cattle with McKnight, and who had converted the machinery to his own use, and who, according to his own testimony, had entered into a conspiracy with defendant McKnight a year after he had delivered the cattle to prevent the true owner of the cattle from recovering the value from him of the stolen cattle by executing a fictitious mortgage on his cattle—all these acts of the thief Albert Newman were for his own gain and to prevent any inquiry being made and so to prevent the owner from again possessing his own property. To say that Newman participated in all these transactions, knowing all the time that the cattle were stolen, and then to say that he was not a principal in the receiving, for his own gain, only because Newman was the thief, is fallacious reasoning. This would be putting a premium on being a thief.

In State v. Huffman, 89 Mont. 194, 201, 296 Pac. 789, 791, it is said, ''The crime of receiving stolen property, defined in section 11388 [Rev. Codes 1921, now R. C. M. 1947, sec. 94-2721, supra], is a distinct statutory crime, and one who, after the crime of larceny is completed, being present, aids and abets others in receiving the stolen property with knowledge that it was stolen, and with the intent, either for his own gain or to prevent the owner from again possessing the property, is a principal and properly prosecuted as such.''

Justice Pound in People v. Kupperschmidt, 237 N. Y. 463, 143 N. E. 256, 257, 32 A. L. R. 447, sets forth their penal law, section 2, which defines ''principal'' and their section 399, relative to corroboration of an accomplice's testimony, both of said sections having substantially the same import as our sections 94-204 and 94-7220, supra.

The Justice states: ''In perhaps a majority of the jurisdictions which have passed upon the question, the rule is that the

thief is not an accomplice of the receiver within the rule requiring corroboration of the evidence of an accomplice. [Citing cases.] These decisions rest on the assumption that because larceny and receiving are separate offenses the thief cannot be indicted for receiving. They disregard the New York definition of principal.''

Quoting also from that case, ''It is said that one cannot receive goods which he has himself stolen. Literally, but not in a legal sense, this may be true; but he is nonetheless 'concerned in the commission of the crime' of receiving, and, therefore, a principal. Penal Law, sec. 2. We are dealing with the legislative definition of guilty participation, not with the common meaning of words. * * * In this case the court said in charging the jury that corroboration was not required because the crimes were different. *Non sequitur.* The charge was erroneous.''

We are of the opinion that under our section 94-204, supra, ▉ the facts and circumstances in this case demonstrate beyond argument that the thief Albert Newman was a principal and therefore an accomplice. 76 C. J. S., Receiving Stolen Goods, sec. 14, page 20, states, ''* * * however, one who steals personal property and sells it to another may, under a proper state of facts, be considered an accomplice of the buyer of the stolen property.''

It may be said, that, if in addition to having stolen the property, ▉ where the thief by his subsequent acts as in this case becomes an accomplice to the further crime of receiving stolen property, the two separate crimes do not become merged nor would the conviction for the theft save the thief from conviction as a principal or accomplice to the subsequent substantive crime of receiving the stolen personal property. See State v. Callaway, Wyo., 267 Pac. (2d) 970, 976. In State v. Rechmitz, 20 Mont. 488, 494, 52 Pac. 264, 266, this court said: ''It is important to not allow the two offenses of larceny and of receiving stolen goods to be merged.''

In this case without the testimony of the confessed thief, Albert Newman, the conviction cannot be upheld. In 111 A. L. R.

1400, under the heading "View that corroboration is required— thief testifying against receiver," it is stated: "Courts in an apparently increasing number of jurisdictions take the view that in a prosecution for receiving stolen property the thief is an accomplice of the defendant, so as to necessitate corroboration of the thief's testimony. * * *"

In 45 Am. Jur., sec. 17, pages 402, 403, it is stated: "* * * the courts in an apparently increasing number of jurisdictions reach a contrary result from the application of the general tests, sometimes by reason of statutes broadening the definition of principals * * * in crime, and take the view that one who steals the property is an accomplice of one who receives it from him with knowledge that it is stolen." In the recent and well reasoned cow stealing case of State v. Callaway, supra [267 Pac. (2d) 975], it is said: "* * * the thief did not himself receive the property but, in fact, parted with it. The criminal intent necessary to make one an accessory [accomplice] to the crime here charged lies not in a criminal intent that the accessory [accomplice] knowingly receive the stolen property, but in the criminal intent to give aid and to abet another in that other person's commission of that substantive crime." See 2 Wharton's Criminal Law, 12th Ed., sec. 1234, page 1551.

In State v. Vines, 49 Wyo. 212, 234, 237, 238, 54 Pac. (2d) 826, 833, 834, that court said: "We have no statute, and there is no rule of the common law, that forbids a conviction on the uncorroborated testimony of an accomplice, but by a rule of practice it is the duty of the court to advise the jury not to convict upon such testimony. [Citing case.] The reason for the rule is the supposed promise or hope of conditional immunity. This supposition is clearly justified in the case at bar." Compare: State v. Sweet, Ohio App., 36 N. E. (2d) 13, 15, 16; Grady v. Commonwealth, 237 Ky. 156, 35 S. W. (2d) 12, 13; People v. Cummings, 293 N. Y. 841, 59 N. E. (2d) 437.

In the case of Johnson v. State, 144 Tex. Cr. 496, 164 S. W. (2d) 702, 703, the court said: "It is sufficient to say that, to show the constituent elements of the offense charged, that is,

the theft of the cattle and the subsequent receipt thereof by the appellant, with knowledge that they had been so acquired, the State depended primarily, upon the testimony of B. K. Collins, the thief who stole the cattle, and by and through whom the theft of the cattle, as also the delivery thereof to the appellant, was shown. The witness was an accomplice—not only by reason of his own admissions, but also because of the fact that he had been charged with, tried for, and convicted of, the theft of the cattle, and, at the time of the giving of his testimony, was a convict in the state penitentiary."

In State v. Coroles, 74 Utah 94, 277 Pac. 203, 205, it was stated: "We see no escape from the conclusion that, where one steals property, takes it, and delivers it to another who receives the property, knowing it to have been stolen, the thief is within the definition of *principal* and hence an 'accomplice.' *He is concerned in a commission of the crime charged against the defendant.* He aided and abetted in its commission. *The evidence of such a witness comes from a tainted source.* He is particeps criminis. Under the provision of our statute (section 8992, supra [Comp. Laws Utah 1917]), his testimony must be corroborated to sustain a conviction. In the instant case, therefore, proper instructions should have been given to the jury defining accomplices, and stating the statutory rule with respect to corroboration." Emphasis supplied.

In Stephenson v. United States, 9 Cir., 1954, 211 F. (2d) 702, 704, 705, the court states:

"The authorities are not agreed as to whether the thief is an accomplice of one knowingly receiving stolen property. * * * An increasing number of jurisdictions follow the so-called minority view that the thief is an accomplice of one to whom he sells stolen property. People v. Kupperschmidt, 1924, 237 N. Y. 463, 143 N. E. 256, 32 A. L. R. 447; State v. Coroles, 1929, 74 Utah 94, 277 Pac. 203. The minority view is based either on a statute broadening the definition of principals or the proposition that one may be both a principal and an accomplice by the doing of

separate and distinct acts; the thief by the separate act of sale becomes an accomplice of the one who purchases from him, knowing the property to have been stolen.

"The logic and reasoning contained in the cases in jurisdictions following the minority rule has considerable appeal in view of the similar broad definition of 'principals' contained in sec. 2, Title 18, U. S. Code ['(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.'], but under the circumstances of this case we find it unnecessary to rely thereon. * * *

"Under the circumstances of this case, the failure of the Court to give the accomplice testimony instruction is such plain error as to impel us to notice it under the provisions of Rule 52(b), Federal Rules of Criminal Procedure, Title 18, U. S. C. A. From a reading of the whole record, it affirmatively appears that such failure was highly prejudicial to appellant. Bihn v. United States, 1946, 328 U. S. 633, 66 S. Ct. 1172, 90 L. Ed. 1485. The Government's case rested almost entirely upon the testimony of accomplice Tester, the thief. The jury should have had the benefit of the instruction in order to enable them to properly evaluate that testimony. We cannot say 'with fair assurance after pondering all that happened' that the judgment in this case would not have been different had the instruction been given. Kotteakos v. United States, 1946, 328 U. S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557."

In the Stephenson Case the court also remarked, "Tester's testimony came from a tainted source and was the character of evidence Congress considered unreliable and sought to protect against by sec. 58-5-1, A. C. L. A. 1949."

We hold that, under section 94-204, supra, the facts and circumstances in this case, the witness Albert Newman, the convicted thief, was a principal in the receiving of stolen property, in that he was concerned in the commission of the crime, that he aided and abetted the same; that the refusal of the court to give proper instructions defining accomplices and the proper

instructions with respect to corroboration, was highly prejudicial to defendant Ernest McKnight, and that the defendant did not have, under the law, a fair trial.

Other questions have been raised but we do not deem it necessary to go into the merits thereof since it does not appear likely they will arise upon another trial.

For the reasons stated, the judgment of conviction is reversed, with directions to grant defendant and appellant Ernest McKnight a new trial.

MR. JUSTICES ANGSTMAN and ANDERSON, concur.

MR. CHIEF JUSTICE ADAIR, dissents.

MR. JUSTICE DAVIS not hearing oral arguments took no part.