No. 12346

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JOHN EDWARD POUND,

Defendant and Appellant.

---

Appeal from:  District Court of the Twelfth Judicial District,
Honorable B. W. Thomas, Judge presiding.

Counsel of Record:

For Appellant:

Morrison and Ettien, Havre, Montana
Robert D. Morrison argued, Havre, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
Jonathan B. Smith, Assistant Attorney General, argued,
Helena, Montana
William M. Solem appeared, Chinook, Montana

---

Submitted:  January 26, 1973

Decided: MAR 27 1973

Filed: MAR 27 1973

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This appeal is taken from a judgment entered on a jury verdict in the district court of Blaine County, convicting John Edward Pound of one count of grand larceny and sentencing him to serve five years in the Montana State Prison. Pound was charged by amended Information with twelve counts of grand larceny and one count of second degree burglary. He entered a plea of not guilty to all charges. The jury verdict of May 10, 1972, found defendant guilty of count one of the amended Information of grand larceny and not guilty of all other counts. From the judgment of conviction and from the court's order denying his motion for a new trial, Pound brings this appeal.

From the trial record unusual and often contradictory facts appear. One Joseph Lewis DeSaye, an American citizen, brought the charges against Pound for alleged acts that took place on his farm near Turner, Montana. DeSaye is a farmer and also a dealer in firearms, related supplies and coins. His activity in this area was not just casual as DeSaye testified his business volume in 1971 was approximately $475,000.

Defendant Pound is 38 years of age, married, and a Canadian citizen residing in the city of Swift Current, Saskatchewan, Canada. For fifteen years he had been employed by the Saskatchewan government as a petroleum engineer. He had been acquainted with DeSaye for approximately ten years. Over the course of their acquaintance Pound had done carpentry and gunsmithing work for DeSaye and in doing so had been given free access to DeSaye's property.

At times previous to the present incident Pound had loaned substantial sums of money to DeSaye and had purchased guns from DeSaye. By their custom, interest on loans and wage payments from DeSaye to Pound took the form of gifts or discounts on guns or related equipment. The two men were also involved in some type

- 2 -

of "coin importing scheme". Pound would take delivery of coins ordered by DeSaye from Canadian sources and either transport them across the border or give them to DeSaye in Canada for his transportation across the border. DeSaye would then reimburse Pound by a check on his Canadian bank account for freight charges and other expenses.

Problems arose between DeSaye and Pound in 1967 when they were charged with violation of smuggling laws by Canadian authorities. In successfully defending the case, Pound incurred attorney fees of $2,075. Pound claimed he had been promised by DeSaye that he would reimburse Pound for all of his costs incurred in defending the charges. Pound testified that he was only given $800 by DeSaye toward those expenses; DeSaye testified that he give Pound over $1,000 for that purpose. As a result, Pound claimed he was owed the amount of $1,275 by DeSaye; DeSaye denied any indebtedness.

Pound also claimed he was owed an additional $100 by DeSaye in connection with a bag of coins he had given DeSaye in 1968 to sell for him in the United States.

It appears that prior to trial, the court instructed DeSaye to produce all of his records which had to do with the international coin transactions with Pound and others. The court further issued a subpoena duces tecum for the production of these records which was properly served and return made to the court. At trial these records were not produced and DeSaye claimed to have only incomplete or parital records of these transactions. On cross-examination DeSaye was extremely vague and evasive concerning certain areas of these transactions. The court denied defendant's motion made at trial to compel production of these records.

On September 17, 1971, DeSaye by telephone extended an invitation to the Pounds to come to his farm suggesting Pound could complete some carpentry work he had in progress and they could view some travel slides. On September 19, 1971, Mr. and Mrs. Pound

traveled from Canada to the DeSaye home arriving about 10:30 or 11:00 a.m. Mr. and Mrs. DeSaye were not at home when the Pounds arrived. A Montana highway patrol car was parked on the premises and Patrolman Harold Savik waited until DeSaye returned at about 1:00 p.m., purchased firearm supplies, and departed shortly after that. Savik and Pound saw each other but did not converse.

Also visibly present in the area were: Osmond Olson, an elderly retired farmer who lived on the premises; Joseph DeSaye's 21 year old son Gregory and his wife; Mrs. Patti Anderson, who was babysitting; and the three younger DeSaye children, Greta, Grant and Brad. Lee Thomas, an agent of the United States Border Patrol, was also present but had concealed his government car behind an outlying barn and had concealed himself in a straw stack. DeSaye had furnished Thomas with two "super-8" movie cameras which he used to take motion pictures of Pound without his knowledge. The films taken by Thomas were introduced into evidence at trial and shown to the jury. The films showed Pound taking rifles, supplies and a sack to his Bronco vehicle and placing them inside.

Between 1:00 and 2:00 p.m., Pound claims DeSaye pursued a discussion with him in which he was questioned extensively about his financial status. At approximately 2:00 p.m. DeSaye suggested they should eat, and Pound went to wash his hands. Looking out the window Pound saw a man creeping by and mentioned it to DeSaye. Pound then went to his Bronco for the claimed purpose of getting his contact lens cleaning equipment. At this point, the testimony is in conflict as to subsequent events. It appears that a pickup truck had been placed by Gregory DeSaye close in front of the defendant's Bronco and the border patrol car had been parked directly behind, so as to wedge the Bronco in. Pound claimed he did not start the Bronco, but reached in to get the contact lens cleaning equipment when DeSaye pulled him out and began struggling with him. DeSaye claimed that Pound started the Bronco and attempted to drive forward, striking the pickup, whereupon

- 4 -

he and his son, Greg, pulled Pound out and "subdued him".

Lee Thomas, the border patrol officer, then came on the scene and locked the Bronco vehicle, and the three men took Pound to a trailer adjacent to the house. It appears that Thomas left the trailer at the request of Pound, leaving DeSaye and Pound alone. There is conflict as to what was said by the parties during this period of time. DeSaye testified that Pound brought up the subject of making a deal. Pound stated that DeSaye brought up the subject and requested a payment of $25,000 to turn over the films which had been taken by patrolman Thomas.

About an hour after he had been taken to the trailer and the other men had returned to the trailer, Pound wished to go to the bathroom. Patrolman Thomas said that he would go with him. Pound asked if he were under arrest and Thomas replied that he was.

During the period of Pound's confinement in the trailer DeSaye made a phone call to the Blaire County sheriff. At about 5:00 p.m. Sheriff Murdo MacLean and Deputy Sheriff Homer Duffner arrived at the DeSaye ranch and were met by Osmond Olson and Floyd Robinson, an acquaintance of DeSaye, who had arrived in the meantime. Upon arrival at the trailer the sheriff stated to Pound that he was under arrest, read a "Miranda warning" statement, handcuffed him, and took him to the sheriff's car where he was placed in the rear seat accompanied by deputy Duffner. After a few minutes the sheriff, accompanied by the other men, took Pound over to his Bronco vehicle. It is undisputed that no search warrant had been obtained by the sheriff and that he did conduct a search of Pound's vehicle at that time. There is, however, conflict in the testimony concerning whether Pound gave his permission to search the vehicle. The sheriff removed some rifles, firearm supplies, and a bag of coins belonging to DeSaye which were later introduced into evidence against Pound at trial.

Pound testified at trial that he took the property from DeSaye, but stated he felt he had notified DeSaye he would take something if no payment was made on the debt of $1,375.

Defendant has assigned six issues for review but we will consider only two inasmuch as four pertain to matters associated with the counts in the Information of which defendant was acquited and they cannot occur again during a new trial.

Defendant's issue one alleges the court erred in denying defendant's motion to suppress the evidence seized in the search of defendant's vehicle and admitting into evidence the items so seized. Issue three, the second of the two we will discuss, alleges the court erred in denying defendant's motion requiring the witness Joseph DeSaye to produce all of his records concerning his past transactions with defendant and others.

Defendant contends the search conducted on the Bronco vehicle was in violation of rights guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution and under Article III, Sec. 7 of the Montana Constitution.

Section 95-602(a), R.C.M. 1947, provides:

"An arrest is made by an actual restraint of the person to be arrested, or by his submission to the custody of the person making the arrest."

By application of that section Pound was placed under arrest at the time he was taken from the Bronco and into the trailer by Joe and Gregory DeSaye and border patrolman Thomas. Patrolman Thomas' testimony indicates that there was no doubt the law officer considered Pound to be under arrest. At any rate the initial arrest took place some hours before sheriff MacLean arrived at the scene.

We cannot accept the state's contention that the sheriff's search of Pound's vehicle was "incident to the arrest". The search was not substantially contemporaneous in time with the arrest. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L ed 2d 576; Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L ed 2d 409.

The state showed no exigent circumstances to justify the warrantless search, such as physical danger to the law enforcement

officer or loss of evidence.  Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L ed 2d 777;  Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L ed 2d 564; State v. Langan, 151 Mont. 558, 445 P.2d 565.

The state then contends Pound gave his permission to the sheriff to make the search of his vehicle.  The sheriff testified that after he arrived at the trailer where Pound was being held he read a "Miranda statement", again informed Pound he was under arrest, and handcuffed him.  Then, according to the sheriff's testimony, he said "Knowing this, do you wish to answer any questions at this time?"  Pound replied "No".  There is nothing in the record to indicate Pound was ever informed that he had a right to refuse a search of his vehicle without a warrant.  Pound was taken handcuffed, in the custody of the sheriff, the deputy sheriff, Lee Thomas the border patrol officer, Joe and Gregory DeSaye, Osmond Olson and Floyd Robinson, out to his Bronco vehicle. The sheriff testified he then asked Pound "Do I have your permission to search this vehicle?"  Pound replied "Yes, go ahead". Pound denied he had been asked for his consent or had given his consent for the search.  The sheriff testified he thought that consent or a warrant for the search was unnecessary because he considered the search to be incident to the arrest.

We have already determined the search did not meet the requirements of being "incident to the arrest" and, concerning the conflict in testimony as to consent, we find that regardless of which version is accepted, a consent given under these circumstances would not qualify as an intelligent and voluntary waiver of a constitutional right.  Pound was a Canadian citizen born in England, presumably not knowledgeable of rights granted under our system of law.  He had not been informed of his right to refuse a warrantless search.  He had been held under arrest for several hours, handcuffed, and taken to the vehicle in the custody of three law officers and four other men who were antagonistic to his interests.

When the state seeks to introduce evidence obtained in a consent search, it must bear the burden of proving that the consent was intelligently and voluntarily given. Kovach v. United States, 53 F.2d 639; Rigby v. United States, 247 F.2d 584. Here, the state has not sustained its burden of proof, and the circumstances attendant to this search appear inherently coercive.

In defendant's third assignment of error, he contends the trial court erred in denying the motion to require the witness Joseph DeSaye to produce all his records concerning his past coin transactions with defendant and other persons which related to transactions with defendant.

The record discloses that a subpoena duces tecum (plaintiff's exhibit S-1) was issued by the Blaine County district court and served by the sheriff upon Joseph DeSaye on April 28, 1972, according to the return which was duly filed. On cross-examination, DeSaye admitted he was present at a pretrial conference and was instructed by the court to produce all records relating to coin transactions. He also admitted that he had certain records of coin transactions involving a Mr. Buyers in Canada, for whom Pound had acted as an intermediary. These records were never produced into court by DeSaye and the court denied a subsequent motion to produce these records, apparently on the basis of irrelevance.

DeSaye's evasive and forgetful testimony as concerned these various transactions was such as to cast an aura of taint and suspicion over the past relationship between himself and Pound; the past coin importing practices of DeSaye; the circumstances surrounding the manner in which DeSaye's property was taken by Pound; and, in fact, the remainder of DeSaye's entire testimony.

It was state's witness DeSaye who introduced the subject of past coin transactions between himself and Pound. The matter was clearly relevant as it pertained to reasons for animosity between the two men arising from such past transactions. It went directly to the issue of DeSaye's credibility as a witness.

In State v. McKnight, 129 Mont. 8, 19, 281 P.2d 816, This Court quoted from 58 Am Jur Witnesses §632, the general rule that cross-examination should be allowed to examine any phase of a general subject introduced on direct examination, and then went on to say:

> "This court has said: 'The right of cross-examination, as has been often said, is a valuable and substantial right, and the courts should incline to extend, rather than restrict it. Cross-examination is the most potent weapon known to the law for separating falsehood from truth, hearsay from actual knowledge, things imaginary from things real, opinion from fact, and inference from recollection, and for testing the intelligence, fairness, memory, truthfulness, accuracy, honesty and power of observation of the witness. It has become a truism in the legal profession that ---"The testimony of a witness is not stronger that [sic] it is made by his cross-examination."'State v. Ritz, 65 Mont. 180, 187, 211 Pac. 298, 300." (Emphasis added).

The trial court's departure from its prior ruling on the subject of the production of these records unduly curtailed defendant's right of cross-examination.

The judgment of conviction is reversed and the cause is remanded to the district court for a new trial.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____
Associate Justices

Mr. Justice John Conway Harrison dissenting:

I dissent.

_____
Associate Justice.

- 9 -